George Herman THOMAS,
Petitioner–Appellant,

v.

Earnest L. HARRELSON (Warden) and the Attorney General of the State of Alabama, Respondents–Appellees.

No. 89–7511.

United States Court of Appeals,
Eleventh Circuit.

Sept. 25, 1991.

Susan E. Russ, Montgomery, Ala., for petitioner-appellant.

J. Thomas Leverette, Montgomery, Ala., for respondents-appellees.

Before KRAVITCH, Circuit Judge, and GODBOLD and CLARK, Senior Circuit Judges.

GODBOLD, Senior Circuit Judge:

The appellant, an Alabama prisoner, was convicted of murder under an indictment charging violation of Alabama Code 13A–6–2. His conviction was affirmed. *Thomas v. State*, 455 So.2d 278 (Ala.Cr.App. 1984).

A petition for writ of error coram nobis, raising the issue of ineffective counsel now presented to this court, was summarily denied. The Alabama Court of Criminal Appeals reversed and remanded for an evidentiary hearing. *Thomas v. State*, 517 So.2d 640 (Ala.Cr.App.1987). Following an evidentiary hearing the trial court again denied the petition. The Court of Criminal Appeals affirmed. *Thomas v. State*, 534 So.2d 1139 (Ala.Cr.App.1988).

Petition for writ of habeas corpus was denied on the merits by the federal district court without an evidentiary hearing.

■ The dispositive issue before us is whether trial counsel was ineffective because he did not raise the issue of a constructive amendment of the indictment created by the proof's showing a different offense than the offense charged. Constructive amendment of an indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged, and it is grounds for reversal per se. *U.S. v. Adams*, 778 F.2d 1117 (5th Cir.1985). Federal cases frequently refer to "constructive amendment." State cases, including those from Alabama, often discuss the issue in terms of "fatal variance." The requirement that a defendant be tried only on the charges set forth in the grand jury indictment finds its origin in the Fifth and Sixth Amendments. The Fifth Amendment commands, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," and the Sixth Amendment gives every defendant "the right ... to be informed of the nature and cause of the accusation." The Alabama Supreme Court has discussed the constitutional principle involved in terms of an accused's Sixth Amendment entitlement to be informed of the nature and the cause of the accusation against him. *Ex parte Washington*, 448 So.2d 404 (Ala.1984). *See also Ex parte Hightower*, 443 So.2d 1272 (Ala.1983) (defendant charged with sexual intercourse without consent; all the proof showed different offense, though under same Code section, of sexual intercourse with consent obtained by artifice. Conviction reversed under rubric of "fatal variance"). The state is incorrect in this case in its contention that Thomas makes only a sufficiency of the evidence claim under state law.

■ There is no procedural bar. *Ylst, Warden v. Nunnemaker*, —— U.S. ——, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Harris v. Reed, Warden*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The

Alabama Court of Criminal Appeals, the last state court to consider this case, addressed on the merits the issue of constructive amendment. 534 So.2d 1139 (Ala.Cr. App.1988).

The issue before us requires understanding two different species of murder existent under Alabama law. In intentional murder the defendant has a deliberate intent to kill or injure one particular victim and no other. It is now embraced in 13A–6–2(a)(1), Code of Ala.1975. The second type of murder appears under various rubrics—depraved heart murder, indifferent murder, reckless murder. It embraces those cases in which the defendant has no deliberate intent to kill or injure one particular individual but manifests an indifference to human life in general.[1] It now appears in 13A–6–2(a)(2), which provides:

(a) A person commits the crime of murder if:

\* \* \* \* \* \*

(2) Under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person;

Section 13A–6–2(a)(2) essentially restates earlier Alabama law. *Northington v. State*, 413 So.2d 1169, 1170 (Ala.Cr.App. 1981). The function of this section is described in *Northington:*

The function of this section is to embrace those homicides caused by such acts as driving an automobile in a grossly wanton manner, shooting a firearm into a crowd or moving train, and throwing a timber from a roof onto a crowded street. *Napier* [*v. State*], 357 So.2d [1001] at 1007 [Ala.Cr.App.1977].

*Id.* at 1172.

The constitutional violation caused by charging "reckless" murder as set out in § 13A–6–2(a)(2) and proving at trial only intentional murder as set out in § 13A–6–

2(a)(1), is described in *Northington*. In that case, on direct appeal, the court reversed a conviction under an indictment charging "reckless homicide" because all the evidence showed acts directed at the particular victim and no other. Northington was charged with extreme indifference and grave risk of death to her infant by withholding food and medical attention. The court held:

The State presented no evidence that the defendant engaged in conduct "under circumstances manifesting extreme indifference to human life" for, while the defendant's conduct did indeed evidence an extreme indifference to the life of her child, there was nothing to show that the conduct displayed an extreme indifference to human life generally. Although the defendant's conduct created a grave risk of death to another and thereby caused the death of that person, the acts of the defendant were aimed at the particular victim and no other. Not only did the defendant's conduct create a grave risk of death to only her daughter and no other, but the defendant's actions (or inactions) were directed specifically against the infant. F. Wharton, *The Law of Homicide* (3rd ed. 1907) at Section 129. This evidence does not support a conviction of murder as charged under Section 13A–6–2(a)(2).

*Id.* at 1171–72.[2]

 The indictment in the present case charged:

GEORGE HERMAN THOMAS, JR., whose name is to the Grand Jury otherwise unknown, did recklessly engage in conduct which manifested extreme indifference to human life and created a grave risk of death to a person other than the said George Herman Thomas, Jr., and did thereby cause the death of Lorre Beth Hutchinson, by striking her on or about her face or head with his hands and feet, thereby knocking her

---

**1.** Alabama cases have often referred to it as "reckless murder," a rubric that sometimes confuses because it draws attention away from whether the defendant's acts are directed at one particular victim or at life in general.

**2.** The interpretation in *Northington* was adopted by the Alabama Supreme Court in *McCormack v. State,* 431 So.2d 1340 (Ala.1983). *See Ex parte Washington,* 448 So.2d 404, 408 (Ala.1984).

prostrate in an inside lane of a heavily travelled public thoroughfare, to-wit: Tuscaloosa Avenue S.W., Birmingham, Jefferson County, Alabama, and thereafter leavi [sic] her lying in said thoroughfare where she was struck and killed by an automobile travelling on Tuscaloosa Avenue S.W., Birmingham, Jefferson County, Alabama, in violation of Section 13A–6–2 of the Alabama Criminal Code.

RE Doc. A.[3] This was drawn in the exact language of § 13A–6–2(a)(2).

On direct appeal the Alabama Court of Criminal Appeals summarized the evidence as follows:

The record reveals that on July 25, 1981, the appellant, Lorre Beth Hutchinson, Maurice Coleman, and Kathy Titton were together, playing cards and drinking. This group had gone to several night clubs where they continued to drink, before returning to the appellant's apartment. The appellant and Lorre Beth Hutchinson had an argument, after which the appellant left his apartment and began drinking whiskey out of a bottle.

The record further reveals that at approximately 2:00 a.m. on the morning of July 26, 1981, the appellant was observed standing over a woman in the doorway of an apartment, and he was kicking her about the head, face and shoulders. The appellant then dragged this woman into the middle of the street and walked back towards the apartment. The appellant was observed motioning for an automobile to "come on and run over her." (R.87) Subsequently, a speeding car came down the street and hit the woman lying in the street. The appellant was arrested at the scene shortly thereafter.

*Thomas v. State,* 455 So.2d 278, 279 (Ala. Cr.App.1984). It is not disputed that Thomas left the victim lying in the street and soon thereafter the speeding car struck her.

There was a constructive amendment in this case. As in *Northington,* the offense alleged required proof of extreme indifference to human life generally as opposed to acts aimed at a particular victim and no other. The evidence showed only acts directed at, and confined to, the single victim. The state attempts to cure the error consisting of proof of an offense not alleged by a theory that the evidence permitted the jury reasonably to find that Thomas was the driver of the speeding car that struck the victim, and, though he had no intent to kill the victim, he was driving recklessly, creating a risk to the world at large. Thus, the state theorizes, the case is within the example mentioned in *Northington,* the act of driving an automobile in a recklessly wanton manner. This theory was accepted, and indeed expanded upon, by the federal district court. The magistrate's report and recommendations, entered without an evidentiary hearing and adopted by the district court, state:

[T]he evidence was such that the jury *could* reasonably infer that although the petitioner beat and dragged the victim unconscious into a street, the event that killed her was the petitioner's wild and reckless driving under the influence of alcohol and drugs. While it is true that the jury could reasonably have found petitioner intended to kill the victim by dragging her into and leaving her in the street, the jury also could have found that the cause of the victim's death was petitioner's reckless driving during which he inadvertently and without any intention directed toward her ran over her. Whether the petitioner was guilty of reckless murder or intentional murder depended upon which scenario of facts the jury believed.

RE Doc. E, p. 11–12. This was plain error. As we discuss below in our analysis of the trial, all the evidence tended to show a purposeful murder with intent to kill or injure the particular victim. No evidence supported the type of murder charged in the indictment. No evidence permitted the

---

**3.** References to "RE" are to record excerpts filed with this court. "R" refers to the trial transcript, "Tr" to the transcript of the state court

evidentiary hearing on petition for writ of error coram nobis.

jury to infer that Thomas engaged in wild and reckless driving or, indeed, that he drove the car, or that he was in the car at all.

Thomas' trial began September 13, 1982. Trial counsel had available to him the decision in *Northington, supra,* decided October 22, 1981, and according to his testimony at the state court evidentiary hearing was aware of it. Before testimony began, in proceedings outside the presence of the jury, the prosecutor represented to the court: "A car ran over her, and we are not saying that he [Thomas] did it . . ." (R. 23–24). In its opening statement, the prosecution stated to the jury its theory, which was that Thomas was *not* driving the car: "Of course, I am not going to contend Mr. Thomas was the one driving the vehicle." (R. 36). Thomas' counsel spelled out to the jury the same theory. In his opening statement he said: "We expect you to see that the evidence will show you that the man who killed this woman is out there driving somewhere." (R. 38).

The trial transcript reveals that eyewitnesses Richard Powell and his girlfriend, Esther Macon, approached the scene on foot going to Powell's apartment, which is in the same complex as Thomas'. Powell saw Thomas in the doorway of Thomas' apartment next door, kicking a woman, later identified as Lorre Beth Hutchinson. Thomas dragged Hutchinson to between the sidewalk and the curb, then to the middle of the street. (R. 87). He stood over her, then beckoned to an approaching pickup truck, saying "Come on and run over her." (*Id.*). The pickup stopped some distance away, then turned off on a side street. (*Id.*). Thomas left Lorre Beth in the street, and Powell saw him "going back to the door of the apartment he had come out of." (*Id.;* see also R. 94). Powell described: "I saw him go in the apartment door. Now, where he went after he got inside the door, I don't know where he went." (R. 94). "[Thomas] didn't come right back out at that particular moment." (R. 97).

Powell saw a speeding car approaching. When Thomas went in his apartment Pow-

ell looked down the street and saw a car coming "real fast." (R. 88). He went into the street and attempted to flag it down, but it did not slow, and he had to run out of the street to keep from being hit. (*Id.*). It struck Lorre Beth and went on up the street. (*Id.*). Powell flagged a third car, which parked crosswise in the street to keep other vehicles from striking her. (*Id.*). The car that struck Ms. Hutchinson was never found or identified nor was its driver.

Policemen, paramedics and firemen came. "Later on he [Thomas] came back out of the apartment and was kneeling down over the girl." (R. 89). He was asking, "What happened, baby, what happened?" (R. 89, 92).

Esther Macon testified that as she approached with Powell she saw Thomas kicking a woman and saw him drag her to between the sidewalk and the curb. She asked Powell for his doorkey and went upstairs to his apartment where she made a single call to the police. (R. 69, 77). At one point in her testimony she estimated that she was upstairs approximately two minutes. (R. 78). At another point she estimated two minutes from the time of her call to the police until she got back downstairs. (R. 82). Before she went downstairs she heard a noise like someone being hit, and Powell called up to her that the woman had been hit by a car. (R. 71, 79). Macon came back downstairs to the scene. Thomas came out "just about almost at the same point." (R. 84). She saw him run to the street, fall on his knees and ask "What has happened?" (*Id.*).

Summarizing, the evidence described Thomas' leaving Lorre Beth in the street and reentering his apartment. Within a very brief time span Esther Macon heard the car strike Lorre Beth, and she and Thomas emerged from the apartments at almost the same time. No one saw Thomas leave the area. There is no evidence that he was driving or even in the vehicle that struck the victim. No evidence showed that the car belonged to him or that he was connected with it in any manner. It is not possible to find in this evi-

dence any basis on which the jury could reasonably infer that Thomas killed Lorre Beth by, as the district court put it, recklessly and inadvertently running over her while driving wildly and recklessly under the influence of alcohol and drugs.[4] There were not two scenarios for the jury to choose between but only one scenario.

■ Defense counsel testified at the state evidentiary hearing. He discussed the claim made in the state petition that he had failed to present to the court the *Northington* constitutional issue. He explained that before trial he formed an opinion that Thomas had gotten into a drunken brawl with the victim, fought with her and kicked her, left her, got into a car and drove from the scene, at which time he ran over her. He explained the basis for this perception. Originally another attorney had represented Thomas, interviewed Thomas and recorded it on tape, and had given the tape to him (the trial counsel). Counsel explained the contents of the tape:

> The interview was taken by tape recording on the same date. And Herman reported to his lawyer on that occasion that he couldn't believe that he had beaten that girl up and run her over with a car while he was drunk. And that, I might state, is the extent of the information given by Herman to any lawyer in my office about how this took place. After that, the only information we ever got was that he just couldn't remember what happened in this case. But he couldn't believe that he could beat her up and run her over.

Tr. 20.

Moreover, counsel testified that the previous attorney said that "witnesses had indicated to him that Herman had beat this girl up and then had run her over with a car," (Tr. 19–20), and "the witnesses who [the previous attorney] had spoken to said that Herman got drunk and ran over the girl after he got drunk." (Tr. 33). These possible witnesses were never identified by

trial counsel in his testimony. He never gave their names.

Counsel described his pre-trial state of mind as follows:

> But based upon the representations that were given to me by [the previous attorney] in his interview forms, and the information given to him by Herman Thomas, it appeared to me that what had happened was that Herman Thomas living with this girl, got into some kind of drunken brawl with her; that he fought with her outside, kicked her a couple of times, left her, then got into a car, drove somehow from the scene, during which time he ran over her.

Tr. 21. And as follows:

> It seemed inconsistent to me that a motorist would run over a girl who failed to properly pass under the car, crush her to death, and then just leave the scene as of being an inconvenience. It seemed consistent to me that it was Herman who did the driving, and that was all the information I had at the time.

Tr. 22.

Counsel attempted unsuccessfully to interview Powell and Moore. He further described his pre-trial expectations:

> Now, I had not talked to Richard Powell, could not, but that knowing that no motorist stopped, not knowing what Richard Powell was going to say, knowing that the witnesses who [previous counsel] had spoken to said that Herman got drunk and ran the girl over after he got drunk. Knowing Herman, that Herman said, "I can't believe I beat her up and run her over with a car," it seemed to me that during the period of time that that witness was gone, that that is what Herman did, I didn't have any other information to know that.
>
> So, as we entered the trial in the case, I didn't see anything wrong with the indictment. It appeared to me to represent what I expected the evidence to be at trial. Herman ran this girl over while he was drinking and smoking dope.

---

**4.** There was evidence that Thomas was drunk. There was no substantial evidence that he was under the influence of drugs.

Then it would appear to me it might not be an intentional killing directed towards Lorre Beth Hutchinson, I think her name was, and yeah, he may have fought with her and kicked her and beaten her, but that while leaving the scene driving like a drunk, he may have run over her and not intended to kill her. Which sounded to me a great deal like section 2 of 13(a)–6–2; which I recognized as amended in 1977 as a reckless homicide. Just like the earlier laws but stated a little different.

And I didn't see that on that occasion that he had indicated any particular intent to kill her.

And you have to remember that my position as his defense lawyer was he gave me absolutely no information otherwise to indicate that, yeah, it was an intentional killing or that it was any different from what I perceived it to be, that he got drunk and ran the girl over.

Tr. 33–34.

These descriptions by counsel of his perceptions up to the beginning of trial are not consistent with his opening statement to the jury. But, pretermitting that, we turn to trial events.

Counsel explained that, as the trial progressed, police testified that nobody was apprehended for running over Ms. Hutchinson, and they looked and found no car, which led him to believe that Thomas "had beaten this girl and attempted to leave the scene and had run over her with the car, because there was no other car to demonstrate that somebody else had hit her." (Tr. 35–36).

Esther Macon testified before Powell took the stand. Counsel described his reaction to her testimony:

[I]t was clear to me at the time I heard Ms. Macon testify, that they had fallen directly within the purview of the confines of this indictment, which were going to be that if Herman didn't kill her, nobody else ran her over, then it must have been him leaving the scene somehow. Which up to that point was abso-

lutely consistent with what I thought this case was going to be.

Tr. 36.

As the trial progressed further counsel began to recognize the possibility of a variance:

I did perceive, as the trial progressed, that there might be a *variance in the evidence*. I never perceived there might be a fatal variance in the charge as compared to the evidence. And I still didn't think that was the case.

Tr. 37–38. By the time he heard Powell's testimony it occurred to him that the facts presented in court were different from those he assumed to be true.

But, I do remember my thoughts were that after the testimony of Richard Powell, that it occurred to me that there was a difference in the facts that I had assumed to be true from what was presented to this Court.

Tr. 38. But counsel did not see that what had occurred was a variance as described in *Northington*.

And although at the trial Mr. Powell testified and surprised me a little bit with the testimony, the answer has to be that I didn't see at that time that that was the variance that they described as being created by the Northington case.

Tr. 64.

The witnesses who were said to have told prior counsel that Thomas had run over Ms. Hutchinson did not testify and were never identified.

Finally, counsel concluded that there was a variance but that it consisted of the court's giving a charge on intentional homicide. Thus, when the testimony was closed and the time had come for instructing the jury he thought "that it was still possible that [Thomas] was the perpetrator and the driver in the car that ran over this girl." (Tr. 45).

We are troubled by the unexplained discrepancy between counsel's description of how he perceived the case and his opening statement to the jury, but possibly the opening statement was merely hyperbole. Summarizing counsel's testimony concern-

ing his pre-trial perception of the case, it was based on statements of previous counsel of what unidentified persons had "indicated", a statement by Thomas that he "couldn't believe he had run over [Hutchinson]," and the professed inability of Thomas to recall what happened. Also counsel was impressed that the car had never been found and no driver located and charged. We have difficulty with whether counsel's perception was reasonable or well founded,[5] but we need not address this point because the trial showed it to be mistaken.

As the trial moved along it became obvious to counsel that his impression of what the evidence was going to be was wrong. No evidence supported his pre-trial perception. Counsel knew of *Northington* and considered the constructive amendment ("variance") issue, but down to the stage of jury instructions he adhered to his perception though the evidence had shown it to be groundless. Counsel's duty was to present the constructive amendment constitutional issue based upon evidence presented at trial. That duty was not lessened by a pre-trial impression of what the evidence was expected to be.

The district court concluded that even if counsel failed in his responsibility no prejudice resulted to Thomas. This holding springs from the decision in *Marsh v. State*, 418 So.2d 191 (Ala.Cr.App.1982) (*Marsh I*), decided in June 1982. In that case the indictment charged that the accused intentionally caused the death of another person in violation of 13A–6–2. The jury was instructed on intentional murder and reckless murder. The Court of Criminal Appeals rejected defendant's contention that there was a fatal variance between the indictment *and the jury instruction*. *Marsh I* was reversed in 1984, in *Marsh v. State*, 461 So.2d 51 (Ala.Cr.App.1984) (*Marsh II*). *Marsh I*, was however, in effect when Thomas was tried. But the issue in *Marsh I* was whether the giving of an alternative jury instruction on murder *creates* a constitutional violation where the evidence supports both types of murder. The issue in this case concerns the effect of the indictment's alleging one kind of murder but the proof's showing only another kind of murder. *Marsh I*, in its short span of life, was not authority that giving an alternative jury instruction would *cure* the total absence of proof of the offense alleged. A Sixth Amendment violation based upon the accused's right to be informed of the nature and the cause of the accusation against him cannot be swept away by an instruction given to the jury after the testimony phase of the trial is over.

The decision of the district court is REVERSED and the case is REMANDED with instructions to grant the writ of habeas corpus subject to the right of the state to retry the petitioner within a reasonable time.

---

**5.** Thomas' statement that he couldn't believe he had run over Hutchinson was construed by counsel as an acknowledgement of fault. It is as well construed as denial of liability or a neutral statement of lack of belief by one who has no recall. Likewise, it is difficult to follow the reasoning that a driver other than Thomas would have stopped instead of fleeing, and that, since police did not find somebody else to arrest, the culprit was probably Thomas. Finally, the lack of recollection by Thomas, who without dispute was drunk, does not contribute to the theory that he left the scene and drove away in a car and ran over Ms. Hutchinson.